**Marsha SEIBER and Alvin Seiber, Plaintiffs–Appellants,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 03–5010.**

United States Court of Appeals, Federal Circuit.

DECIDED: April 19, 2004.

Phillip D. Chasey, Stoel Rives LLP, of Portland, OR, argued for plaintiffs-appellants. With him on the brief were Charles F. Adams and Scott E. Crawford.

Kathryn E. Kovacs, Attorney, Environment & Natural Resources Division, Appellate Section, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Kelly A. Johnson, Acting Assistant Attorney General; and Katherine J. Barton, Attorney.

John E. Echeverria, Georgetown Environmental Law & Policy Institute, Georgetown University Law Center, of Washington, DC, for amicus curiae the Audubon Society of Portland, et al.

Before NEWMAN, LOURIE, and DYK, Circuit Judges.

DYK, Circuit Judge.

This is a Fifth Amendment temporary takings case involving the Fish and Wildlife Service's ("FWS") denial of a federal incidental take permit ("ITP") to authorize logging on a forty-acre tract of land in Oregon belonging to the appellants Marsha and Alvin Seiber (the "Seibers"). The Court of Federal Claims granted summary judgment for the government, holding that the takings claim was not ripe and that, in any event, the permit denial did not constitute a taking under the Fifth Amendment. *Seiber v. United States*, 53 Fed.Cl. 570 (2002). We hold that the Seibers' claim was ripe for review. On the merits, we affirm because the permit denial was neither a physical nor a regulatory taking.

BACKGROUND

The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544 (2000), prohibits the "take" of an endangered species, *id.* § 1538(a)(1)(B), which includes harassing, harming, pursuing, wounding or killing such an animal, *id.* § 1532(19). The Environmental Protection Agency ("EPA")

defines the ESA prohibition against "harming" endangered species to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3 (2004). *See generally Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,* 515 U.S. 687, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). The ESA also provides a permitting mechanism to allow the "incidental take" of an endangered or threatened species in certain circumstances, authorizing "any taking otherwise prohibited ... if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).

The ESA invests the Secretary of the Department of the Interior with the authority to "determine whether any species is an endangered species or a threatened species." *Id.* § 1533(a)(1). Pursuant to this responsibility, the FWS, a division of the Department of the Interior, listed the northern spotted owl as a threatened species in 1990. Endangered & Threatened Wildlife & Plants; Determination of Threatened Status for the Northern Spotted Owl, 55 Fed.Reg. 26, 114 (June 26, 1990).

Oregon maintains a system of endangered species protection as well, which coexists and overlaps with the federal system. *See* Or.Rev.Stat. § 496.182(1) (2003). Oregon law defines the term "endangered species" as including species so designated by the Oregon State Fish and Wildlife Commission or by the federal ESA. *Id.* §§ 496.004(6), 496.176. Oregon law requires the implementation of rules "necessary to ensure the survival" of such endangered species, including the protection of nesting sites that are "critical to the survival of individual members of the species." *Id.* § 496.182(2). Once the Oregon De-

partment of Forestry ("ODF") has designated a certain area as protected habitat for an endangered species, an individual may engage in otherwise prohibited activity only by securing a federal ITP from the federal FWS. *See* Or. Admin. R. 629–665–0210(5) (2004).

The Seibers own a two hundred-acre parcel of land in Linn County, Oregon, which included merchantable timber. In January 1996 ODF implemented regulations to protect the northern spotted owl in accordance with the FWS's determination of their threatened status. ODF designated a seventy-acre area in Linn County, Oregon, as a protected spotted owl-nesting habitat, including forty acres of the Seibers' two hundred-acre property.

On February 4, 1998, the Seibers submitted a "written plan" to ODF, as required by Oregon law, to log timber on the regulated forty acres. *See* Or.Rev.Stat. § 527.670 (1994); Or. Admin. R. 629–665–0210(1) (2004). ODF rejected the Seibers' logging application on February 19, 1998, explaining that ODF could not make an exception to the protected status of the nesting site unless the Seibers procured a federal permit (an ITP) in accordance with the ESA. The Seibers sought a hearing at the Oregon Board of Forestry, arguing that the ODF rule should be withdrawn because it constituted a taking of their property. *See* Or. Admin. R. 629–672–0200 (2004). On March 28, 1998, the Ore-

gon Board of Forestry affirmed ODF's denial, finding that "[t]he denial of the Seiber's [sic] written plan was appropriate [and did] not cause a taking under the U.S. or the Oregon Constitutions." (J.A. at 266.) The Seibers appealed to the Circuit Court of the State of Oregon for the County of Linn, which dismissed their action because "[t]akings claims are not ripe for adjudication until the Seibers apply for an Incidental Take Permit from the U.S. Fish & Wildlife Service." *Seiber v. State*, No. 98–0649 (Or.App. Dec. 17, 1999). The Seibers apparently did not seek review in the Supreme Court of Oregon.[1]

Meanwhile, on November 24, 1999, the Seibers submitted an ITP application to the FWS, seeking a permit to log on their regulated forty acres. The Seibers' application included a Habitat Conservation Plan ("HCP"). Such a plan is required to describe the likely impact of the requested "take," the applicant's plan to "minimize and mitigate such impacts," the alternative options pursued by the applicant, and the reasons those options were not ultimately chosen. 16 U.S.C. § 1539(a)(2)(A)(i). As of January 3, 2000, the Seibers had yet to receive a response from the FWS, and they sent a letter requesting notice to be published in the Federal Register within ten days in order to commence with the required public notice and comment period.[2] On January 11, 2000, the FWS responded, explaining that it was reviewing

---

**1.** The Seibers have instituted separate actions seeking compensation from the State of Oregon for a temporary taking. In the first of these cases the Seibers' claims were rejected on summary judgment in the Circuit Court for the State of Oregon for Linn County. The Court of Appeals of Oregon in *Seiber v. State ex. rel. Or. State Bd. of Forestry*, 178 Or.App. 319, 37 P.3d 259 (2001), affirmed without opinion, and the Supreme Court of Oregon denied review, 334 Or. 260, 47 P.3d 486 (2002), as did the United States Supreme Court, 537 U.S. 1104, 123 S.Ct. 866, 154 L.Ed.2d 773 (2003). The second case, *Seiber*

*v. State*, No. 01–0333, is pending in the Circuit Court for Linn County.

**2.** Notice in the Federal Register is a required preliminary step in the ITP application process, intended to allow an "opportunity for public comment" on the application and the related conservation plan, 16 U.S.C. § 1539(a)(2)(B), and to ensure that "[i]nformation received by the [FWS] as part of [the] application shall be available to the public as a matter of public record at every stage of the proceeding," *id.* § 1539(c). *See also Gerber v. Norton*, 294 F.3d 173, 176 (D.C.Cir.2002).

the ITP application, in particular the HCP, to determine whether it contained the necessary information. On February 7, 2000, the Office of the Solicitor of the Department of the Interior advised the Seibers that "[a]ccording to the FWS, the application lacks much of the biological analysis and information routinely provided by their other applicants [and] was prepared without any discussion with the Service employees." (J.A. at 217.) In particular, the letter highlighted that the Seibers' ITP application did not seem to follow the steps outlined in the FWS's Habitat Conservation Handbook. The Seibers replied on February 9, 2000, disagreeing that the HCP was inadequate and urging that prior "closely parallel[ ]" HCPs had been accepted by the FWS. (J.A. at 218.) The Seibers stated that "[i]t seems that the [FWS] is engaging in 'make weight' arguments not to publish [in the Federal Register]. There is no desire on the Seibers' part to discuss modifications to the permit application and the process can be expedited by publishing notice in the Federal Register without further delay." (J.A. at 218–19.) Notice was published in the Federal Register on February 18, 2000, notifying the public of the Seibers' ITP application and requesting written comments on the permit application and HCP by March 20, 2000.

After completion of the notice and comment period, the FWS formally rejected the Seibers' ITP application on July 6, 2000, on the ground that the application did not satisfy applicable criteria for mitigation. The FWS stated that "[b]ecause minimization and mitigation programs exist that are based on a sound biological rationale, are commensurate with the impacts they address, and are practicable, we have come to the conclusion that the mitigation offered in the [Seibers'] HCP does not meet" the ITP criteria. (J.A. at 228.)

The letter also suggested alternatives "under which we believe a permit could be issued," including selective harvesting of the regulated forty acres, harvesting of the regulated forty acres that would eliminate suitable habitat initially but regenerate such habitat within a specific amount of time, or harvesting of the unregulated one hundred sixty acres. (J.A. at 229.) Finally, the FWS letter informed the Seibers of their right to request reconsideration of the denial in accordance with 50 C.F.R. § 13.29. The Seibers requested reconsideration of the ITP denial on July 28, 2000. Reconsideration was denied, and the Seibers appealed to the Regional Director of the FWS on September 26, 2000. The Regional Director denied the appeal on November 9, 2000, explaining that "in the absence of any new information or modification of their HCP proposal, we must continue to conclude that the mitigation and minimization measures in the Seibers' proposed HCP do not meet the permit issuance criteria for an incidental take permit under the ESA." (J.A. at 47.)

The Seibers brought suit in the Court of Federal Claims on July 26, 2001, seeking compensation from the United States for a taking, claimed to result from the FWS's permit denial. The complaint included four counts, alleging: (1) that the ITP denial constituted a categorical physical taking under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); (2) that the ITP denial constituted a per se regulatory taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); (3) that the ITP denial constituted both a temporary and a permanent regulatory taking under *Agins v. City of Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), because the FWS could not advance a legitimate governmental interest for the denial [3]; and

3. The temporary takings allegation of this

claim was later abandoned because, as the

(4) that the ITP denial constituted a regulatory taking under the test of *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

Subsequent to the filing of the complaint, on August 3, 2001, the ODF informed the Seibers that it no longer opposed logging on the forty-acre area in question because the land was no longer inhabited by the spotted owls and did not require ongoing protection. The Seibers in turn wrote to the FWS on August 7, 2001, asking whether the forty-acre site was considered a protected habitat and whether the FWS would oppose logging. The FWS responded in a letter dated September 12, 2001, stating that it had never barred logging on the Seibers' property despite the fact that it had declined to issue an ITP. The FWS's letter stated:

> The Service has not opposed logging proposed by the Seibers. The Seibers' initial permit application, however, did not meet permit issuance criteria found at section 10 of the Endangered Species Act (ESA). Issuance of an incidental take permit provides those acting under permit authority with the assurance that their activities may proceed without risk of violating the prohibitions of section 9 of the ESA. The Service has offered technical assistance in developing an incidental take permit application meeting issuance criteria. Should the Seibers decline to accept the Service's offer and choose to proceed with logging without a section 10 permit, any take which may occur would not be authorized under the ESA.

(J.A. at 237.)

On November 26, 2001, the government filed a motion to dismiss the complaint for failure to state a claim or, in the alternative, for summary judgment. The Seibers responded on January 28, 2002, with a cross-motion for summary judgment. Subsequent to these filings, the FWS visited the Seibers' property in April of 2002 at the direction of the Court of Federal Claims to "develop alternatives for [the] Seiber[s] to consider in the development of a habitat conservation plan." (J.A. at 14.) Following this visit, the FWS sent the Seibers a letter on June 3, 2002, announcing that an ITP was no longer necessary because changes in the "landscape conditions" as well as the spotted owls' nesting patterns indicated that "the area will no longer be likely to attract and maintain spotted owls" and that therefore "the planned activities by the Seibers are not likely to result in a take of the spotted owls under the Endangered Species Act." (J.A. at 15.) Despite this determination by the FWS, the Seibers informed the Court of Federal Claims during oral argument that they would continue to pursue their claims but do so in the context of temporary rather than permanent takings.

Thereafter, on September 4, 2002, the Court of Federal Claims entered summary judgment in favor of the government. The court held that the Seibers' takings claim was not ripe, finding that the FWS's permit denial was not final under our court's decision in *Boise Cascade Corp. v. United States*, 296 F.3d 1339 (Fed.Cir.2002), because the "FWS had the discretion and an indicated willingness to consider a modified plan." *Seiber*, 53 Fed.Cl. at 575.

On the merits, the court concluded that the ITP denial, even if ripe, would not have constituted a taking. *Id.* The court held that the denial was not a physical taking under *Loretto*, concluding that this very argument had recently been rejected

---

Seibers' counsel explained, it was based on the mistaken theory that the government had secured an injunction to prevent the Seibers from logging. Oral Argument Tr. at 25–26, *Seiber v. United States*, No. 01–432L (Fed.Cl. June 6, 2002).

in *Boise Cascade.* *Id.* at 576. Neither did the permit denial constitute a per se regulatory taking under *Lucas* because the Seibers did not meet the *Lucas* standard requiring a loss of "*all* economically beneficial uses" of the land. *Id.* (quoting *Lucas,* 505 U.S. at 1019, 112 S.Ct. 2886) (emphasis in original). Finding that the forty-acre regulated parcel did not constitute "a separate property interest apart from [the] other [one hundred sixty] acre[s] containing merchantable timber," the court held that the Seibers had not lost all economic viability in their land. *Id.* at 577. Likewise, the court denied the Seibers' *Agins*-based regulatory takings claim on the ground that the Seibers never asserted that "the government's interest in protecting the northern spotted owl is not legitimate," but asserted instead that "the interest in protecting the owl was not 'sufficient to cause' the government to designate private lands as critical habitat." *Id.* at 578. This assertion, the court held, did not state a takings claim under *Agins.* Finally, the court rejected the Seibers' regulatory takings claim under *Penn Central* because the Seibers did not make a sufficient showing of the economic impact on their property that resulted from the alleged taking or a sufficient showing that they were "singled out" to bear the burden of the ESA. *Id.* at 580.

The Seibers appeal the Court of Federal Claims' grant of summary judgment in favor of the government. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

■ We review the Court of Federal Claims' grant of summary judgment without deference. *Agwiak v. United States,* 347 F.3d 1375, 1377 (Fed.Cir.2003).

### I

We note at the outset that there is a predicate question that we need not decide—whether federal law actually barred logging on the Seibers' property. There is, of course, no federal taking if federal law did not bar the logging. *See Yuba Natural Res., Inc. v. United States,* 821 F.2d 638, 640 (Fed.Cir.1987) (explaining that a regulatory taking requires that "the government action has destroyed the owner's use and enjoyment of his property" in full or in part). Unlike the situation in *Boise Cascade,* there was no federal injunction barring logging of the Seibers' property. *See Boise Cascade,* 296 F.3d at 1346. In the absence of such an injunction, it is not clear that federal law barred the logging. As the FWS explained in its letter dated September 12, 2001, nothing in the ESA required the Seibers to obtain an ITP before logging. Rather, an "incidental take permit provides those acting under permit authority with the assurance that their activities may proceed without risk of violating the prohibitions of section 9 of the ESA." (J.A. at 237.) The question then becomes whether the ESA itself prohibited logging of the Seibers' land because it would adversely affect the owl habitat. For purposes of this opinion we assume, without deciding, that federal law prohibited the logging during the period of the alleged taking, November 9, 2000–June 3, 2002.

### II

The procedural posture of this case is unusual. Following the filing of the government's motion for summary judgment and the Seibers' opposition, the Seibers agreed to abandon the temporary takings claim in count three of their complaint, their only temporary takings claim (which was apparently based on the mistaken theory that the government had secured an injunction to prevent the logging). Oral Argument Tr. at 25–26, *Seiber v. United States,* No. 01–432L (Fed.Cl. June 6, 2002). Then, as noted above, on June 3, 2002, the government informed the Seibers by letter

that logging of the entire two hundred-acre parcel was permitted. At this juncture, the Seibers appeared to agree that the only claim available to them was for a temporary taking. Under such circumstances, it might have been expected that the Seibers would seek leave to amend their complaint to state a new temporary takings claim, and that the government would file a new summary judgment motion addressing this temporary takings claim. Neither occurred. Rather, both parties appeared at the Court of Federal Claims for oral argument on June 6, 2002, where they effectively agreed that the complaint should be treated as amended to state a temporary takings claim and that the summary judgment motion should be treated as addressed to such a claim. Oral Argument Tr. at 26–27, *Seiber v. United States*, No. 01–432L (Fed.Cl. June 6, 2002). We do not condone the informality of the procedures followed by the parties and the Court of Federal Claims. Such informality creates a confusing record on appeal. But the Seibers do not contend on appeal that they should have been able to supplement the record on the temporary takings issue. Under these circumstances we shall treat the complaint as effectively amended and the government's motion for summary judgment as addressed to the temporary takings claim. We thus consider the propriety of the summary judgment on the record made in the Court of Federal Claims on the government's original motion.

### III

■ The Supreme Court has recognized that property owners should be compensated for temporary regulatory takings as well as permanent ones. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 318, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). Such takings "are not different in kind from permanent takings, for which the Constitution clearly requires compensation," *id.* (citing *San Diego Gas & Elec. Co. v. City of San Diego*, 450 U.S. 621, 657, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981)) (Brennan, J., dissenting), because the loss imposed on a property owner by a temporary taking "may be great indeed," *id.* at 319. Supreme Court cases, as well as decisions from our own court, recognize that a temporary taking may arise in one of two ways. First, "a temporary taking occurs when what would otherwise be a permanent taking is temporally cut short." *Wyatt v. United States*, 271 F.3d 1090, 1097 n. 6 (Fed.Cir.2001). Temporary takings of this category may result when "a court invalidates a regulation" that had previously effected a taking, *id.;* when "the government elects to discontinue regulations after a taking has occurred," *id.;* or when "the government denies a permit ... [and] at some [later] point reconsiders the earlier denial and grants a permit (or revokes the permitting requirement)," *Boise Cascade*, 296 F.3d at 1347. The "essential element" of this type of temporary taking "is a finite start and end to the taking," *Wyatt*, 271 F.3d at 1097 n. 6. In the case of a rescinded permit denial, therefore, "the initial denial of a permit is still a necessary trigger" for the temporary taking. *Boise Cascade*, 296 F.3d at 1347.

■ Alternatively, a temporary "taking may occur by reason of extraordinary delay in [the] governmental decision making" process. *Wyatt*, 271 F.3d at 1098 (quoting *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 803 (Fed.Cir.1993)) (internal quotation marks omitted); *see also Cooley v. United States*, 324 F.3d 1297, 1306 (Fed.Cir.2003); *Boise Cascade*, 296 F.3d at 1347 n. 6. In such a case, a property owner may be entitled to compensation for property loss incurred while the government was in the process of de-

ciding whether to allow the contested activity. This type of temporary takings claim may be asserted "notwithstanding the failure [of the government] to deny a permit" or affirmatively prohibit a certain use of the property. *Boise Cascade,* 296 F.3d at 1347 n. 6. Nonetheless, "mere fluctuations in value during the process of governmental decision making, absent extraordinary delay" do not give rise to a compensable temporary taking under this second category because such losses are considered "incidents of ownership." *See Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 332, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002); *see also Cooley,* 324 F.3d at 1306. Each of these categories of temporary takings is governed by its own standards. A property owner asserting a temporary taking as a result of the rescission of a regulation or the eventual grant of a permit that was initially denied is not required to show extraordinary delay. *See Boise Cascade,* 296 F.3d at 1349 ("[A]bsent denial of the permit, only an extraordinary delay in the permitting process can give rise to a compensable taking.").

■ The temporary taking in this case is alleged to fall in the former category—the effective rescission of the permit denial. The Seibers claim a temporary taking from November 9, 2000 (the date their permit was finally denied on appeal) to June 3, 2002 (the date the FWS informed the Seibers that there were no further federal impediments to logging their forty acres). In order to establish a temporary taking, the Seibers must show a final denial. The question is whether "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). The government ar-

gues that the FWS's November 9, 2000, action did not constitute a final permit denial and that the Seibers' claim is not ripe for review. The government contends that the FWS's permit denial was not a final decision because it indicated that "several possible alternative plans" were available, Br. of Appellee at 22, and the Seibers declined to pursue ongoing discussion with the FWS. The Court of Federal Claims agreed. Under our decision in *Cooley,* 324 F.3d at 1297, however, we hold that the November 9, 2000, action was final, and the Seibers are entitled to proceed with their temporary takings claim.

In *Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), the Supreme Court considered when the denial of a permit becomes a ripe regulatory taking. The Court emphasized that the crux of this ripeness analysis is whether "the permissible uses of the property are known to a reasonable certainty." *Id.* at 620, 121 S.Ct. 2448. Following *Palazzolo,* we explained in *Cooley* that "[a] permit denial is final when the applicant has no appeal mechanism available and the denial is based on an unchanging fact." 324 F.3d at 1302. In *Cooley* the appellants were denied a fill permit under section 404 of the Clean Water Act, 33 U.S.C. § 1344 (2000). *Cooley,* 324 F.3d at 1299. The government argued, however, that this permit denial was not a final decision. *Id.* at 1302. We held that the appellants' takings claim was ripe because the permit denial was "based on what [the government] considered adequate information, and because no ... regulation permitted an administrative appeal." *Id.* Furthermore, we held that the fact that the permit denial letter "extended an invitation to [the appellants] to submit more information if [they] wished to continue to pursue a permit ... did not alter the finality of the denial or the ripeness of [the appellants'] taking claim in the Court of Federal

Claims." *Id.* at 1303. Rather, the denial was based on unchangeable facts and a regulatory scheme that did not permit reconsideration of a denial, neither of which would be affected by the submission of further information in support of the permit application.

As in *Cooley*, the FWS permit denial here was final. Despite the fact that the FWS repeatedly referred to the inadequacy of the Seibers' Habitat Conservation Plan, the FWS made clear to the Seibers that they were denied an ITP. The FWS did not communicate that it lacked adequate information to decide whether to grant or deny the ITP application. Instead, the FWS informed the Seibers that their "application must be denied" because it was insufficient to warrant an ITP. (J.A. at 225.) The FWS itself highlighted the finality of this denial by informing the Seibers of their right to request reconsideration of the denial. The Seibers sought reconsideration in accordance with 50 C.F.R. § 13.29(a)(1), and they subsequently appealed the denial of reconsideration as outlined in § 13.29(e). The Regional Director of the FWS denied this appeal on November 9, 2000, concluding that "the mitigation and the minimization measures in the Seibers' proposed HCP do not meet the permit issuance criteria for an incidental take permit under the ESA." (J.A. at 47.) Despite the Regional Director's offer to provide "technical assistance to the Seibers if they wish to develop an improved HCP," (J.A. at 48), the regulations clearly conceive of this letter as a final permit denial, stating that "[t]he decision of the Regional Director or the Director shall constitute the final administrative decision of the Department of the Interior," 50 C.F.R. § 13.29(f)(3) (2004). Because

the regulatory scheme governing the ITP process deemed the government's action final and did not allow any further reconsideration, the government's invitation to continue discussion at the Seibers' initiative, as in *Cooley*, "did not alter the finality of the denial or the ripeness of [the appellants'] taking claim." *See Cooley*, 324 F.3d at 1303.[4]

## IV

On the merits, the Seibers offer a number of theories as to why they are entitled to compensation for a temporary taking.

### A

■ First, the Seibers contend that FWS's permit denial was a physical taking, arguing that they were denied the right to exclude others (*i.e.*, the spotted owls), which is the hallmark of a physical taking and that they are entitled to compensation under *Loretto*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868, for a temporary physical occupation.

■ The Supreme Court has long held that regulatory restrictions on the use of property do not constitute physical takings. *See, e.g., Tahoe–Sierra*, 535 U.S. at 303, 122 S.Ct. 1465. Our court reiterated this understanding in *Boise Cascade*, a case directly on point, where we held that a prohibition against logging in protected owl habitat did not constitute a physical taking. 296 F.3d 1339. Contrary to the Seibers' contention, nothing in the Supreme Court's recent decision in *Brown v. Legal Foundation of Washington*, 538 U.S. 216, 123 S.Ct. 1406, 155 L.Ed.2d 376 (2003), suggests that *Boise Cascade* was incorrectly decided.

**4.** In holding that the denial was final, we do not address the government's contention, based on language in *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 352 n. 8,

106 S.Ct. 2561, 91 L.Ed.2d 285 (1986), that the Seibers' ITP application did not comply with federal law, and that its denial therefore could not have given rise to a taking.

In *Brown* the Supreme Court considered a takings challenge to the State of Washington's use of interest from lawyers' trust accounts ("IOLTA") to fund the state's legal aid programs. While the Court held that the IOLTA system did not constitute a compensable taking, it explained that "[a] law that requires ... funds be transferred to a different owner for a legitimate public use ... could be a *per se* taking requiring the payment of 'just compensation.'"[5] *Id.* at 240, 100 S.Ct. 2124. Even if this statement can be taken to mean, as the Seibers contend, that the government's authorization of third parties to utilize property may constitute a physical taking, it does not undermine our holding in *Boise Cascade.* The governmental protection of owls in *Boise Cascade,* as in our case, is not comparable to a government authorization to third parties to utilize property.

## B

Second, the Seibers contend that the government is liable for a taking under the Supreme Court's decision in *Agins* because the logging bar did not serve a legitimate public purpose. We disagree.

In *Agins,* residential developers brought a takings claim against the city of Tiburon, California, when it re-zoned the appellants' property as suitable for single family dwellings exclusively. The appellants contended that the city had taken their property without just compensation because the new zoning ordinance completely destroyed the commercial value of their property. 447 U.S. at 258–59, 100 S.Ct. 2138. The Supreme Court stated that "[t]he application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests, or denies an owner economically viable use of his land." *Id.* at 260, 100 S.Ct. 2138 (citations omitted). The Court held the zoning ordinances did not constitute a taking, reasoning, first, that "the zoning ordinances substantially advance[d] legitimate governmental goals" and, second, that "[a]lthough the ordinances limit[ed] development, they neither prevent[ed] the best use of the appellants' land, nor extinguish[ed] a fundamental attribute of ownership." *Id.* at 261–62, 100 S.Ct. 2138 (citations omitted).

The government argues that the question of the legitimacy of the governmental interest does not provide a separate takings test under *Agins.* The Supreme Court has never found a compensable taking on the theory that the government acted without a legitimate interest, and the Court has declined to decide the continued viability of *Agins. Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 704, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) (declining to decide the "continued viability" of *Agins* because the issue was not preserved on appeal); *but see Tahoe–Sierra,* 535 U.S. at 333, 122 S.Ct. 1465 (suggesting that the appellants could have pursued various alternative theories to support their takings claim, including an *Agins*-based theory that the government action "did not substantially advance a legitimate state interest"). Our court has held that "in a takings case we assume that the underlying governmental action was lawful." *Rith Energy, Inc. v. United States,* 270 F.3d 1347, 1352 (Fed.Cir.2001) (refusing to consider the appellant's "assertions that the government's decisions in this case were driven by political pressure"). We need not decide, however,

---

5. The Court denied the appellants compensation "[b]ecause ... the owner's pecuniary loss ... is zero whenever the Washington law is obeyed—there has been no violation of the Just Compensation Clause of the Fifth Amendment in this case." *Brown,* 538 U.S. at 240, 123 S.Ct. 1406.

whether *Agins* presents a distinct takings test based on the lack of a legitimate governmental interest because, even if it did, it is indisputable in this case that the ESA and the ITP process serve a legitimate public purpose. *See generally Sweet Home*, 515 U.S. at 687, 115 S.Ct. 2407; *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The Seibers' allegation that there has been inequality in the FWS's enforcement of the ITP process, even if true, does not undermine the legitimacy of the underlying governmental interest.

## C

■ Third, the Seibers argue that their permit denial constituted a categorical taking under the Supreme Court's theory in *Lucas* because it denied them *"all* economically beneficial or productive use" of the forty acres at issue. *See Lucas*, 505 U.S. at 1015, 112 S.Ct. 2886 (emphasis added). In *Lucas* the Supreme Court explained that despite the settled precedent to engage in "essentially ad hoc, factual inquiries" when evaluating takings claims, two categories of takings are "compensable without case-specific inquiry into the public interest advanced in support of the restraint": (1) where there has been a "physical invasion" of an owner's property and (2) "where [a] regulation denies all economically beneficial or productive use" of an owner's property. *Id.* The Supreme Court reasoned that the latter type of regulatory taking is effectively comparable to a physical taking, *id.* at 1017, 112 S.Ct. 2886, and it held that the petitioner was per se entitled to compensation because the trial court concluded that the regulation rendered his property "valueless," *id.* at 1020–22, 112 S.Ct. 2886.

Relying on language in *Tahoe–Sierra*, the government argues that there is no such legal category as a temporary categorical taking because by its very nature a temporary taking allows a property owner

to recoup some measure of its property's value. *See Tahoe–Sierra*, 535 U.S. at 321, 122 S.Ct. 1465. We note, however, that our case law suggests that a temporary categorical taking may be possible. In *Boise Cascade* we explained that the Supreme Court may have only "rejected [the] application of the per se rule articulated in *Lucas* to temporary development moratoria," 296 F.3d at 1350, and not to temporary takings that result from the rescission of a permit requirement or denial, *id.* at 1351–52. We need not decide this issue because, even assuming that there can be a temporary categorical taking, such a thing did not occur here because the Seibers did not lose all value in their parcel as a whole.

■ Even in those "relatively rare situations" where the *Lucas* categorical rule applies, *Lucas*, 505 U.S. at 1018, 112 S.Ct. 2886, the economic impact of the regulation must be assessed on the parcel as a whole. The Supreme Court has repeatedly instructed that the impact of an alleged taking must be considered in terms of the "parcel as a whole," whether analyzed by categorical or ad hoc standards. *See Tahoe–Sierra*, 535 U.S. at 329–32, 122 S.Ct. 1465 (holding that the *Lucas* per se rule only applies in the "extraordinary case" where three prerequisites are met: the regulation must (1) permanently deprive, (2) the *whole* property, (3) of all its value); *see also Penn Cent.*, 438 U.S. at 130, 98 S.Ct. 2646; *Palm Beach Isles Assocs. v. United States*, 208 F.3d 1374, 1380, *aff'd on reh'g*, 231 F.3d 1354, *reh'g en banc denied*, 231 F.3d 1365 (Fed.Cir.2000); *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1179 (Fed.Cir.1994); *Fla. Rock Indus., Inc. v. United States*, 791 F.2d 893, 904 (Fed.Cir.1986) (*"Fla. Rock I"*). The "parcel as a whole" analysis is a federal requirement. In other words, there can only be a categorical regulatory taking if the *whole parcel* of land is deprived of *all* beneficial use.

Here, all parties agree that the forty acres of regulated land were part of a larger two hundred-acre parcel of land. There is no contention that a categorical taking resulted from the loss of "*all* economically beneficial or productive use" of the Seibers' entire two hundred-acre parcel. *See Lucas,* 505 U.S. at 1015, 112 S.Ct. 2886 (emphasis added). Rather, the Seibers contend that each tree presents a separate property interest, and that they lost all economically beneficial or productive use of individual trees.

■■■ The Seibers argue that state law should determine whether individual trees constitute a separate property interest for purposes of the takings analysis.[6] State law, of course, plays an important role in takings jurisprudence. For example, it has a significant role in defining the property interests that may be afforded constitutional protection under the Takings Clause. *See Lucas,* 505 U.S. at 1031, 112 S.Ct. 2886; *Phillips v. Wash. Legal Found.,* 524 U.S. 156, 164, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998); *Maritrans Inc. v. United States,* 342 F.3d 1344, 1352 (Fed. Cir.2003); *Conti v. United States,* 291 F.3d 1334, 1340 (Fed.Cir.2002). State law is also pertinent to significant aspects of the regulatory takings analysis, such as determining the existence of a nuisance defense. *See Lucas,* 505 U.S. at 1031, 112 S.Ct. 2886. However, state law does not determine how property interests are to be

aggregated for purposes of identifying the parameters of the "parcel as a whole," whether that analysis is under *Lucas, Agins,* or *Penn Central.* Rather, the Supreme Court has made clear that whether something constitutes a separable property interest is a question to be determined by the federal law of takings considering the tradition in the historic common law. In *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987), where the petitioner challenged a state statute preventing certain mining as an unconstitutional taking, the Supreme Court rejected the petitioner's contention that the parameters of the property allegedly taken should be determined according to state law. *Id.* at 500, 107 S.Ct. 1232; *see also Palm Beach,* 208 F.3d at 1380–81; *Forest Props., Inc. v. United States,* 177 F.3d 1360, 1365–66 (Fed.Cir.1999); *Loveladies,* 28 F.3d at 1180–81. The Court reviewed prior takings decisions where it had considered what "constituted a separate segment of property for Takings Clause purposes," and it concluded that the analysis should not "turn on whether state law allowed the separate sale of the segment of property." *Keystone,* 480 U.S. at 500, 107 S.Ct. 1232.

No authority has been brought to our attention that holds as a matter of federal takings law that trees are a separate property interest before they are severed from their underlying land.[7] We need not, how-

**6.** The Seibers rely on a comment in a footnote in *Lucas,* stating:

[O]ur 'deprivation of all economically feasible use' rule ... does not make clear the 'property interest' against which the loss of value is to be measured.... The answer to this difficult question may lie in how the owner's reasonable expectations have been shaped by the States' law of property—*i.e.,* whether and to what degree the State's law has accorded legal recognition and protection to the particular interest in land with respect to which the claimant alleges a dim-

inution in (or elimination of value). In any event, we avoid this difficulty in the present case....

505 U.S. at 1016 n. 7, 112 S.Ct. 2886. We do not read this passage to suggest that the law of a particular state should govern the parcel as a whole analysis.

**7.** Indeed, even the recent Oregon case law cited by the Seibers does not support the contention that each tree constitutes a separate property interest for purposes of determining the parameters of the parcel as a whole. These cases, including *Coast Range*

ever, reach this question. As the Court of Federal Claims explained, even if trees are a separate property interest from the underlying ground, we must consider the timber as a whole. The Seibers have never alleged that their timber on the entire two hundred-acre parcel was rendered valueless. We reject the Seibers' categorical takings claim under *Lucas* because the ITP denial did not deprive the Seibers' of all economically viable use of the timber on the two hundred-acre parcel.

### D

Finally, the Seibers contend that there has been a regulatory taking under the *Penn Central* standard. Again we disagree.

In *Penn Central,* the Supreme Court outlined the relevant factors to be considered in the regulatory takings analysis: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment backed expectations"; and (3) "the character of the governmental action." *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646. The Supreme Court, as well as our own court, has repeatedly held that this *Penn Central* "essentially ad hoc" examination of a number of factors governs regulatory takings cases where, as here, there has not been a categorical taking.

*Tahoe–Sierra,* 535 U.S. at 326, 122 S.Ct. 1465; *see also Lucas,* 505 U.S. at 1015, 112 S.Ct. 2886; *Loretto,* 458 U.S. at 426, 102 S.Ct. 3164; *Cooley,* 324 F.3d at 1306; *Boise,* 296 F.3d at 1350; *Fla. Rock I,* 791 F.2d at 900–901. These factors are considered in terms of the "parcel as a whole." *Penn Cent.,* 438 U.S. at 130–31, 98 S.Ct. 2646.

The existence of economic injury is indispensable to demonstrating a regulatory taking. *See Hendler v. United States,* 175 F.3d 1374, 1385 (Fed.Cir.1999) ("A pivotal criterion governing whether a regulatory taking has occurred is the impact the regulatory imposition has had on the economic use, and hence value, of the property . . . if the regulatory action is not shown to have had a negative economic impact on the property, there is no regulatory. taking."); *see also Fla. Rock Indus., Inc. v. United States,* 18 F.3d 1560, 1571 (Fed.Cir.1994) ("*Fla. Rock II* "). The Court of Federal Claims found insufficient economic injury to the parcel as a whole, implying that there could be no temporary taking unless there was a complete loss.[8] The Seibers argue that a taking need not be complete to be compensable. We agree that a partial temporary taking may be compensable. *See Palazzolo,* 533 U.S. at 619, 121 S.Ct. 2448; *Cienega Gardens v. United States,* 331 F.3d 1319, 1343

---

*Conifers, LLC v. State,* 189 Or.App. 531, 76 P.3d 1148 (2003), *Boise Cascade Corp. v. Bd. of Forestry,* 325 Or. 185, 935 P.2d 411 (1997), and *Boise Cascade Corp. v. Bd. of Forestry,* 131 Or.App. 538, 886 P.2d 1033 (1994), reject the application of the parcel as a whole rule to the takings analysis under Oregon's constitution. *See Coast Range Conifers,* 76 P.3d at 1156–58.

8. The Court of Federal Claims stated:
   [P]laintiffs cannot assert that they lost value on their property as this was an alleged temporary taking that has ended. . . . At the same time, the alleged taking apparently did not affect plaintiffs' property as a whole, as they were able to log 15 acres and were planning before the permit requirement was lifted to log 25 more acres on other areas of their property. Thus, even if the plaintiffs were able to prove that the 40 acres were taken, it would not have been a compensable taking because plaintiffs' property interest as a whole was not impacted to the extent required. . . . Ultimately, plaintiffs' property was not rendered valueless by the permitting process regulations because now that the permit requirement is lifted, the timber is able to be logged, and the property has thus regained its value. *Seiber,* 53 Fed.Cl. at 579.

(Fed.Cir.2003); *McKay v. United States,* 199 F.3d 1376, 1383 (Fed.Cir.1999); *Creppel v. United States,* 41 F.3d 627, 631 (Fed.Cir.1994); *Fla. Rock II,* 18 F.3d at 1570. We find, nonetheless, that the Court of Federal Claims properly granted the government summary judgment on this issue because there has been no showing of economic injury caused by the temporary taking.

As mentioned above, the period of the alleged temporary taking, November 9, 2000–June 3, 2002, is the relevant period for purposes of assessing the economic impact to the Seibers' parcel as a whole, constituting the timber on the entire two hundred-acre parcel. Although the Seibers argue on appeal that the forty-acre portion of that timber decreased in value and suffered from root rot during the temporary takings period, they did not provide any evidence on summary judgment of economic loss during that period. The only affidavit submitted to rebut the government's motion for summary judgment was that of Marsha Seiber, and, at most, it supported a permanent takings claim. This affidavit's discussion of economic impact is limited to the following statement: "The subject timber that we desire to log has no economic productive use or value unless harvested.... The FWS's action in denying us the right to log the subject timber has denied us all economic productive use of that property." (J.A. at 38.)

The Seibers' alleged inability to harvest, however, was reversed on June 3, 2002, and Marsha Seiber's affidavit did not describe any economic impact imposed by the alleged temporary taking. The Seibers' counsel admitted as much at oral argument in our court, stating that the Seibers had "not specifically [addressed the economic impact] as to the two year delay." [9] Our court has repeatedly made clear that the failure to provide evidence to support the existence of economic injury is fatal to a takings claim. In *Forest Properties,* a case where the appellant challenged a permit denial to fill wetlands as an uncompensated regulatory taking, we explained that the "economic impact of the regulation upon the claimant is measured by the change, if any, in the fair market value caused by the regulatory imposition." 177 F.3d at 1367 (quotations omitted). We held that there was insufficient economic impact to constitute a taking under the *Penn Central* test because the appellant had "failed to introduce convincing evidence to show the amount, if any, by which the value of the relevant property ... was reduced by the denial of the permit." *Id.; see also Maritrans,* 342 F.3d at 1358 ("When considering *Penn Central's* economic impact factor, a court must 'compare the value that has been taken from the property with the value that remains in the property.'" (quoting *Keystone,* 480 U.S. at 497, 107 S.Ct. 1232)); *Fla. Rock II,*

---

9. The following exchange occurred at oral argument in our court:

THE COURT: Did you address the economic impact of the temporary taking, that is the alleged temporary taking, the two-year delay?

COUNSEL FOR APPELLANTS: No because we addressed the economic impact originally under the permanent taking claim. Once they changed their mind the day before the hearing, no we did not.

Even if we were to also consider the affidavit of David Cox, which was not included in the appendix on appeal and was not part of the record on the government's motion for summary judgment, it merely suggested that blowdowns affected the timber between 1998–2000 and that the trees continued to be plagued by root rot. Aff. of David R. Cox, Pls.' Reply in Supp. of the Cross Mot. for Partial Summ. J. on the Issue of Liability, *Seiber v. United States,* No. 01–0333 (Fed.Cl. Mar. 11, 2002) ("Cox affidavit"). The Cox affidavit made no effort to identify the Seibers' loss from the inability to log during the relevant period, November 9, 2000–June 3, 2002.

18 F.3d at 1567. The Seibers' temporary takings claim also fails under the *Penn Central* test because they "failed to introduce convincing evidence to show the amount, if any, by which the value of the relevant property ... was reduced" by the alleged temporary taking. *See Forest Props.*, 177 F.3d at 1367.

## CONCLUSION

For the foregoing reasons, we affirm the Court of Federal Claims' grant of summary judgment in favor of the government.

AFFIRMED.

## COSTS

No costs.